## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF SOUTH CAROLINA

In re,

Christopher Noel Ladd and
Donna Lynn Ladd,

                                        Debtors.

Michelle L. Vieira, as chapter 7 trustee
for debtors Christopher Noel Ladd
and Donna Lynn Ladd,

                                        Plaintiff,

v.

CertusBank National Association and Price,
Pyles, Dangle, Parmer & Rooks, P.C.,

                                        Defendants.

Bankruptcy Case No. 10-05226-dd

Adv. Pro. No. 12-80238-dd

Chapter 7

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO AMEND THE SCHEDULING ORDER

This matter is before the Court on a motion for summary judgment filed by defendant Price, Pyles, Dangle, Parmer & Rooks, P.C. ("PPDPR") on May 8, 2014, and a supplement thereto filed on June 6, 2014. Also before the Court is a motion for summary judgment filed by defendant CertusBank National Association on May 14, 2014, and a supplement thereto filed on June 6, 2014. The plaintiff, Michelle L. Vieira, as chapter 7 trustee for the bankruptcy estates of debtors Christopher Noel Ladd and Donna Lynn Ladd ("Plaintiff"), filed a response in opposition to the motions for summary judgment, and the defendants both submitted replies in support of their motions. Additionally, Plaintiff filed a motion to amend the scheduling order on June 13, 2014. PPDPR responded in opposition, and CertusBank filed a limited response in which it neither opposed nor supported Plaintiff's motion. Plaintiff submitted a reply in support of her motion. The Court held a hearing on the motions on June 24, 2014. After careful consideration of the applicable law, arguments of counsel, and evidence submitted, the

1

defendants' motions for summary judgment are granted, and Plaintiff's motion to amend the scheduling order is denied.

# FACTS[1]

This dispute arises out of several loan agreements between the Ladds and First Georgia Banking Company ("First Georgia"). The first note was signed by Donna Ladd and is dated April 6, 2004. CertusBank's ex. K (Docket 105-12); D. Ladd Dep. 20-22 (Docket 107-2); C. Ladd Dep. 108-109 (Docket 107-1). The note was for the purchase of an Infiniti automobile and was in the amount of $58,959.98. CertusBank's ex. K; D. Ladd Dep. 20-22; C. Ladd Dep. 108-109. Donna Ladd does not recall whether she paid off this loan, but she knows she has never been sued for collection on it. D. Ladd Dep. 26; C. Ladd Dep. 111. Subsequently, Donna Ladd purchased a Chevy Tahoe, which was financed through a note dated October 31, 2005, with a note number ending in 8489 in the amount of $72,901.55. CertusBank's ex. L (Docket 105-13); C. Ladd Dep. 111-13. Neither the April 6, 2004 note nor the October 31, 2005 note is mentioned in Plaintiff's second amended complaint. The Court will refer to the October 31, 2005 note as "Loan X."

Chris Ladd signed the last page of a "Note, Disclosure and Security Agreement" dated September 12, 2005, in the amount of $27,683. CertusBank's ex. A (Docket 105-2); C. Ladd Dep. 43. This loan is referenced as "Loan 1" in the second amended complaint and was secured

---

[1] Plaintiff's recitation of facts in her response to the defendants' motions for summary judgment largely consists of block quotations of deposition testimony without any significant discussion of the context or significance of the testimony quoted.

by a 1997 Cadillac Catera.[2]  CertusBank's ex. A.  As of February 14, 2007, Chris Ladd was behind on his monthly payments on Loan 1.  CertusBank's ex. C (Docket 105-4); C. Ladd Dep. 46.

Chris Ladd signed page 3 of a document titled "Consumer Real Estate Secured Balloon Note" dated May 25, 2006, reflecting a principal loan amount of $77,053.35.  CertusBank's ex. D (Docket 105-5); C. Ladd Dep. 47-48.  He does not recall whether he had pages 1 and 2 when he signed page 3.  C. Ladd Dep. 48.  He would not routinely sign a contract without having the first few pages of the contract.  *Id*.  He does not remember whether he read the May 25, 2006 note, but he normally reads contracts before signing them.  *Id*. at 49.  At his deposition, Chris Ladd testified he would not have signed a balloon note and that he did not know the terms of Loan 2.  *Id*. at 102.  Plaintiff refers to the May 25, 2006 note as Loan 2 in the second amended complaint.  Donna Ladd testified at her deposition that she "believe[s]" her signature is on page 3 of Loan 2, but she is not sure.  D. Ladd Dep. 32-33.  The proceeds of Loan 2 were used to pay off the balance of Loan X.  CertusBank's ex. L; CertusBank's ex. M (Docket 105-14); C. Ladd Dep. 116-18, 120.

Plaintiff alleges First Georgia represented to the Ladds that Loan 2 would only be secured by a Chevy Tahoe and that various documents involved in Loan 2 contain forgeries of the Ladds' signatures, including a security deed for real property the Ladds owned at 925 White Oak Drive, Newnan, Georgia ("Newnan property").  Plaintiff also alleges First Georgia represented to the Ladds that Loan 1 would be consolidated into Loan 2.  Chris Ladd testified at his deposition that he did not sign a security deed and that someone forged his name to the security deed.  C. Ladd

---

[2] Plaintiff alleges in the second amended complaint that Loan 1 was secured by a Ford Explorer.  This difference between the allegations and the loan documents does not affect the outcome of this Order.

Dep. 52, 77.  He does not know who signed his name to the security deed.  *Id*. at 77-78.  Donna

Ladd testified at her deposition that she did not sign a security deed and she does not remember

seeing a security deed.  D. Ladd Dep. 54-55.  Additionally, Chris Ladd alleges that his purported

signature on a "notice of right of rescission for closed-end credit" in connection with Loan 2 is a

forgery.  C. Ladd Dep. at 61-62.  Donna Ladd testified at her deposition that her purported

signature on a settlement statement in connection with Loan 2 is not genuine and that she does

not know who signed her name to this document.  D. Ladd Dep. 43-44.  She also testified the

signature appearing on a truth in lending disclosure in connection with Loan 2 is not hers and she

does not know who signed her name to this document.  *Id*. at 46.  In addition, she indicated she

does not recall seeing a notice of right to copy of appraisal report related to Loan 2 and that the

signature on this document is questionable.  *Id*. at 47-48.  She "thinks" the signature on a notice

of right of recession is hers but does not remember signing the document.  *Id*. at 48.  She testified

the signature on an agreement to provide insurance appears to be hers but she does not recall

signing the document.  *Id*. at 50.  When asked why she felt the date next to her signature on the

agreement to provide insurance was "iffy," she responded: "Because I don't - - I don't date it like

that, and Chris doesn't date it like that.  So - - and I don't remember ever seeing anything about

an Allstate Insurance on Sutherland Drive.  Never heard of that in my life."  *Id*. at 50-51.

Finally, she asserts she has never seen a consumer security agreement in connection with Loan 2

and that the signature on this document is not her signature.  *Id*. at 52.

On or about May 17, 2006, the Ladds received an offer of purchase and sale on the

Newnan property, which they accepted on May 25, 2006.  CertusBank's ex. G (Docket 105-8);

C. Ladd Dep. 69-70.  The Ladds conveyed the Newnan property to the purchaser by warranty

deed dated June 8, 2006, which was recorded on June 9, 2006.  CertusBank's ex. H (Docket 105-

9); C. Ladd Dep. 80-81; D. Ladd Dep. 56-57.  The alleged forged security deed on the Newnan

property was recorded on July 10, 2006.

What Plaintiff describes as Loan 3 in the second amended complaint is a "Consumer

Loan Agreement – Closed-End" dated June 8, 2006, in the amount of $21,139.70 with a Bayliner

boat as collateral.  CertusBank's ex. F (Docket 105-7).  Chris Ladd initially testified at his

deposition that his signature appears on the final page of this loan agreement but then indicated

he was not certain because there is no date next to the signature and he normally puts a date next

to his signature.  C. Ladd Dep. 81-83.  He recalls signing a document similar to CertusBank's

exhibit F to purchase a Bayliner boat.  *Id.* at 83.

In a letter dated May 12, 2007, addressed to an employee of First Georgia, Chris Ladd

indicated he was aware of First Georgia's position that the Newnan property was security for

Loan 2.  CertusBank's ex. K (Docket 97-12).  In this letter, Chris Ladd stated "as far as the

charge of selling the Newnan Property without paying off the loan with you, I had no idea that it

was tied to my house." *Id.*

The Ladds entered into a forbearance agreement with First Georgia, which is dated July

2, 2007.  CertusBank's ex. I (Docket 105-10).  Chris Ladd acknowledges initialing pages 1 and 3

and signing page 4 of the forbearance agreement but believes someone forged his initials on page

2.  C. Ladd Dep. 131-32.  He believes there is something different about the last page of the

forbearance agreement he signed and the agreement shown to him at his deposition.  *Id.*  Donna

Ladd acknowledges initialing pages 1 through 3 and signing page 4 of the forbearance

agreement.  D. Ladd Dep. 57-58.  Page 1 of the forbearance agreement, which the Ladds

acknowledge initialing, lists the loan numbers, dates, and amounts for Loan 1, Loan 2, and Loan

3. CertusBank's ex. I.  Page 1 also states "Borrowers are in default pursuant to the terms of the

Loans as a result of their failure to make monthly payments as required pursuant to the terms of the Loan Documents and, as to [Loan 2], by the conversion of the collateral through the sale of real property pledged for that loan." *Id*.

First Georgia, on February 10, 2009, filed suit in state court in Carroll County, Georgia against the Ladds ("Carroll County action"). Second Am. Compl. ex. 12 (Docket 64-12). In the complaint filed in the Carroll County action, First Georgia alleged Chris Ladd was obligated on Loans 1 and 3 and both Ladds were obligated on Loan 2. *Id*. First Georgia alleged the Ladds defaulted on these loans by not making the monthly payments when due and by selling the Newnan property. *Id*. First Georgia asserted causes of action for breach of promissory note, conversion, and attorney fees. *Id*. PPDPR represented First Georgia in the Carroll County action. The Ladds did not assert counterclaims in the Carroll County action or otherwise defend that action by way of an answer. C. Ladd Dep. 150; D. Ladd Dep. 67. On July 22, 2010, the Ladds filed a voluntary petition under chapter 7 of the Bankruptcy Code, and they received a discharge on October 29, 2010.

Plaintiff alleges Chris Ladd was serving in the military at the time the Carroll County action was filed and that the complaint caused him to lose his security clearance, which in turn, resulted in him missing a promotion.

First Georgia, through its attorney at PPDPR, filed a proof of claim for $147,196.13 in the Ladds' bankruptcy on February 7, 2011. According to its answer to the second amended complaint, CertusBank acquired the banking operations of First Georgia pursuant to a purchase and assumption agreement with the Federal Deposit Insurance Corporation dated May 20, 2011. First Georgia's attorney at PPDPR sent a letter to Plaintiff, dated July 5, 2011, in which he discusses the proof of claim First Georgia filed and states in part:

The reason there is such a high unsecured indebtedness in this matter is that the Ladds borrowed money from the bank which was to be secured by their real property.  They executed a security deed to First Georgia Banking Company on [the Newnan property], and then, within days of the pledge of that real estate as collateral for the loan, sold that residence and did not pay the proceeds thereof to the Bank.  I am attaching for your review a copy of the security deed executed by Mr. & Mrs. Ladd on May 25, 2006, as security for their loan in the amount of $77,053.35.  I am also attaching for your review a copy of the warranty deed where the Ladds sold that same property on June 8, 2006.  That sale occurred prior to the security deed they executed to First Georgia Banking Company appearing in the real records of Coweta County, Georgia.  As a result, the closing attorney was not aware of the pledge of the property to First Georgia Banking Company and the Ladds received the proceeds of that sale without any funds being paid to the Bank.  That action led to the Bank filing a civil action against the Ladds in Georgia for conversion.  This bankruptcy case was filed prior to any judgment in that matter.

Pl.'s ex. E (Docket 107).

Plaintiff filed this adversary proceeding on October 29, 2012.  She filed an amended complaint on November 9, 2012.  Plaintiff alleged the following causes of action against PPDPR in her amended complaint: violation of the Fair Debt Collection Practices Act ("FDCPA"), violation of the "Soldiers' and Sailors' Civil Relief Act," and abuse of process.[3]  She asserted the following causes of action against both CertusBank and PPDPR: violation of the Georgia Residential Mortgages Act, forgery, and conspiracy.  Additionally, she alleged the following causes of action against CertusBank only: fraudulent misrepresentation, negligent misrepresentation, breach of contract by fraudulent act, and conversion.  She demanded and consented to this Court conducting a jury trial on her causes of action.  PPDPR answered the amended complaint and counterclaimed.  CertusBank did not answer timely, and its default was entered.  CertusBank then moved for an extension of time to respond to the complaint and for

---

[3] The Soldiers' and Sailors' Civil Relief Act is the predecessor act to the Servicemembers Civil Relief Act that is currently in effect.

relief from the entry of default.  CertusBank and Plaintiff entered into a Consent Order, which relieved CertusBank of its default and gave it additional time to answer.

Prior to the Consent Order relieving CertusBank of its default being entered, PPDPR moved for judgment on the pleadings.  CertusBank joined in support of the motion.  In its Order entered August 12, 2013, the Court granted judgment on the pleadings to the defendants on the FDCPA, conspiracy, and abuse of process causes of action Plaintiff asserted on behalf of Donna Ladd's bankruptcy estate.  This Order also identified several deficiencies in the amended complaint and gave Plaintiff fourteen days to file a second amended complaint addressing these deficiencies.

Plaintiff did not timely file the second amended complaint as directed in the August 12, 2013 Order, and the Court on August 30, 2013, at 10:48 a.m., entered an Order directing Plaintiff to appear and show cause why all of the causes of action for which the defendants sought judgment on the pleadings should not be dismissed with prejudice.  That same day at 5:35 p.m. Plaintiff filed the second amended complaint in which she asserts the following causes of action: violation of the FDCPA against PPDPR on behalf of Chris Ladd's bankruptcy estate, abuse of process against PPDPR, conspiracy against both defendants on behalf of Chris Ladd's bankruptcy estate, wrongful foreclosure against both defendants, fraudulent misrepresentation against CertusBank, negligent misrepresentation against CertusBank, breach of contract by fraudulent act against CertusBank, and conversion against CertusBank.  Plaintiff again demanded and consented to this Court conducting a jury trial on her causes of action.  PPDPR and CertusBank moved to strike or dismiss the second amended complaint.    By Order entered December 12, 2013, this Court dissolved the rule to show cause, struck the abuse of process

cause of action brought on behalf of Donna Ladd's bankruptcy estate, dismissed the wrongful foreclosure cause of action, and otherwise denied the defendants' motions to strike or dismiss.

CertusBank answered the second amended complaint.  In its answer, CertusBank asserts this adversary proceeding is non-core, consents to entry of a final judgment by this Court, and reserves its right to consent to or contest a jury trial conducted by this Court.  PPDPR answered the second amended complaint and asserted a counterclaim for attorney fees under 15 U.S.C. § 1692k(a)(3).  In its answer, PPDPR asserts this adversary proceeding is non-core and consents to the entry of a final judgment by this Court.


## JURISDICTION AND AUTHORITY TO ENTER A FINAL ORDER

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334, and venue is proper under 28 U.S.C. § 1409.  Pursuant to 28 U.S.C. § 157(a), the United States District Court for the District of South Carolina has referred this adversary proceeding to this Court.  Plaintiff does not indicate in the second amended complaint whether she asserts this adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).  Both defendants assert this adversary proceeding is non-core.  Regardless, all parties through their pleadings have consented to this Court entering a final judgment.


## MOTION TO AMEND SCHEDULING ORDER

Plaintiff filed a motion to amend the scheduling order the same day that her response to the defendants' motions for summary judgment, under the scheduling order, was due.  Plaintiff provided scarce facts in support of her motion and no legal authority.  Plaintiff indicated she had been unable to depose individuals associated with the defendants who were involved with the

facts underlying this lawsuit.  At the time the motion to amend the scheduling order was filed,

the deadline for discovery had passed.  Through the defendants' responses and Plaintiff's reply,

the Court was provided a better understanding of the circumstances leading to Plaintiff's motion.

Plaintiff's counsel issued Federal Rule of Civil Procedure 30(b)(6) notices of deposition,

indicating the depositions would take place at its office in Mount Pleasant, South Carolina, for

CertusBank on April 24, 2014, and for PPDPR on April 25, 2014.  Docket 115-1.  There was a

dispute regarding the topics to be covered at the depositions, which the parties resolved

sufficiently to move forward with the depositions.  Docket 115-2; Docket 115-3.  PPDPR's

counsel indicated it had a conflict with April 25th and requested the deposition be rescheduled to

May 1st or May 2d of 2014.  Docket 115-3.  Plaintiff's counsel rescheduled the depositions of

the defendants to May 1st and May 2d and issued amended notices of deposition.  Docket 115-4;

Docket 115-5.  PPDPR's counsel emailed Plaintiff's counsel on April 23, 2014, asserting that the

deposition of PPDPR should take place in Georgia and requesting that the deposition again be

rescheduled from May 1, 2014, to the week of May 5th through the 9th or May 12th through the

16th because PPDPR's counsel had an engagement the evening of May 1st that prevented it from

traveling to Georgia.  Docket 110-1.  PPDPR's counsel sent a second email on April 24, 2014,

noting the fact that the deposition was actually scheduled for May 2, 2014, and again requesting

it be rescheduled and indicating it needed to receive a response from Plaintiff's counsel that day

or PPDPR would move for a protective order.  *Id*.  On April 24, 2014, Plaintiff's counsel

responded that "[a]s a professional courtesy, [it would] agree to postpone both the CertusBank,

N.A. and the PPDPR depositions."  *Id*.  Plaintiff's counsel indicated its desire to hold depositions

at its office and closed by stating "[w]e will be back in touch with you with [sic] regarding

Amended Notices of Depositions and the dates that we are available."  *Id*.  Plaintiff's counsel did

10

not follow up regarding rescheduling depositions until June 12, 2014, the day before its response

to the defendants' motions for summary judgment was due.  Docket 110-3.

The following transpired after April 24, 2014.  PPDPR moved, on May 8, 2014, for

summary judgment.  In a footnote to its motion, PPDPR requested the Court modify the

scheduling order, require an expedited response to its motion, and hold an expedited hearing on

its motion.  Alternatively, it asked the Court stay the dispositive motions deadline.  The Court

denied these requests in an Order entered May 13, 2014, and indicated PPDPR could file a

supplement to its motion prior to the deadline for filing motions for summary judgment or

withdraw its May 8th motion, supplement it, and re-file it as one inclusive document.

CertusBank moved for summary judgment on May 14, 2014.  Plaintiff, on May 21, 2014, moved

for permission to file a joint response to both motions for summary judgment.  The next day the

Court entered the following Order:

> Under the scheduling order entered in this case, the deadline for motions for
> summary judgment is June 6, 2014, and the response deadline is June 13, 2014.
> Plaintiff may file a joint response to Defendants' motions for summary judgment.
> However, Plaintiff's response should address both the motions for summary
> judgment currently pending and any further motions for summary judgment or
> supplements filed by June 6, 2014.

Docket 101.  Both defendants filed supplements to their motions for summary judgment on June

6, 2014.  Plaintiff filed her motion to amend the scheduling order and her response to the

motions for summary judgment on June 13, 2014.

The scheduling order deadlines were set based on information all parties to this adversary

proceeding provided, including a report filed on January 27, 2014, and signed by all parties

requesting 120 days for discovery and a pretrial approximately 30 days later.  Docket 90.  The

Court entered its scheduling order on January 31, 2014, setting a discovery deadline of May 30,

11

2014; a dispositive motions deadline of June 6, 2014; and a deadline of June 13, 2014, for responses to dispositive motions.  Docket 91.

Because Plaintiff filed her motion to amend the scheduling order after the deadline for completing discovery, PPDPR asserts the applicable standard is set forth in Federal Rule of Bankruptcy Procedure 9006(b)(1), which provides that "when an act is required or allowed to be done at or within a specified period . . . by order of court, the court for cause shown may at any time in its discretion . . . on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect."  Plaintiff argues Federal Rule of Civil Procedure 16(b)(4), made applicable by Federal Rule of Bankruptcy Procedure 7016, is the appropriate standard.  Rule 16(b)(4) provides that "[a] scheduling order may be modified only for good cause and with the judge's consent."  "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  *Dilmar Oil Co. v. Federated Mut. Ins. Co.*, 986 F. Supp. 959, 980 (D.S.C. 1997).  "Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief."  *Id*.

The Court need not resolve this dispute between PPDPR and Plaintiff regarding the appropriate standard because even applying the Rule 16(b)(4) standard, Plaintiff is not entitled to the relief she seeks.  The Court is not sure why PPDPR's counsel requested the deposition of its client be moved to May 1st or 2d only to then ask that the deposition be moved again.  Regardless, Plaintiff's counsel never followed up its April 24th email regarding rescheduling depositions until the day before Plaintiff's response to the motions for summary judgment was due and did not move to amend scheduling order until the day its response was due.  In the interim, the defendants filed two motions for summary judgment and two supplements to those motions, Plaintiff moved for permission to file a joint response to the motions for summary

judgment, the Court entered an Order on May 22d reminding parties of the June 6th and June 13th deadlines under the scheduling order for dispositive motions and responses, and the deadline for completing discovery passed on May 30, 2014.  The filing of a motion for summary judgment often means the discovery completion deadline is near and most scheduling orders of which this Court is aware set the dispositive motions deadline after the discovery completion deadline.  Plaintiff's counsel expressed frustration at PPDPR's counsel over its unwillingness to consent to an extension of the scheduling order.  However, PPDPR's counsel does not have a duty to remind Plaintiff's counsel of upcoming deadlines or of the need to reschedule depositions.  Plaintiff's counsel previously has failed to meet deadlines in this adversary proceeding, as it did not meet the deadline for filing a second amended complaint set in the August 12, 2013 Order, resulting in the issuance of a rule to show cause.  The only explanation Plaintiff's counsel gave for missing that deadline was an electronic calendaring error.  The carelessness of Plaintiff's counsel with respect to monitoring scheduling order deadlines and timely moving to amend those deadlines is "not compatible with a finding of diligence and offers no reason for a grant of relief."  *Id*.  Plaintiff's counsel has not shown that the May 30th discovery completion deadline could not have been met despite its diligent efforts to do so.  *Id*. Plaintiff's motion to amend the scheduling order is, therefore, denied.


## MOTIONS FOR SUMMARY JUDGMENT

### A. Standard

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable by Bankruptcy Rule 7056, the moving party is entitled to summary judgment if the pleadings, responses to discovery, and the record reveal that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As the party seeking summary judgment, the moving party bears the initial responsibility of informing this Court of the basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This initial burden requires that the moving party identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323; *see also Anderson*, 477 U.S. at 249.

Though the moving party bears this initial responsibility, the nonmoving party must then produce "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed R. Civ. P. 56(e). In satisfying this burden, the nonmoving party must offer more than a mere "scintilla of evidence" that a genuine dispute of material fact exists, *Anderson*, 477 U.S. at 252, or that there is "some metaphysical doubt" as to material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

On a motion for summary judgment, "'the facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).

## B. Analysis

### 1. Statutes of limitation

The defendants assert all of Plaintiff's causes of action are barred by the applicable statutes of limitation.  There is no dispute between the parties over what statutes of limitation apply.  Regardless of whether South Carolina substantive law or Georgia substantive law applies to Plaintiff's state law causes of action, the statutes of limitation set forth under South Carolina law govern because statutes of limitation are procedural.  *See Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 87-88 (4th Cir. 1989).  The statutes of limitation for all of Plaintiff's state law causes of action are three years.  *See* S.C. Code Ann. §§ 15-3-530(1); 15-3-530(5).  With respect to Plaintiff's FDCPA cause of action, "[a]n action to enforce any liability created by [the FDCPA] may be brought . . . within one year from the date on which the violation occurs."  15 U.S.C. § 1692k(d).

"[A]ll actions initiated under [South Carolina Code Annotated] Section 15-3-530(5) must be commenced within three years after the person knew or by the exercise of reasonable diligence should have known that he had a cause of action."  S.C. Code Ann. § 15-3-535.  Actions initiated under section 15-3-530(5) consist of those "for assault, battery, or any injury to the person or rights of another, not arising on contract and not enumerated by law."  All of Plaintiff's state law causes of action, with the exception possibly of the breach of contract by fraudulent act cause of action, fall within the scope of section 15-3-530(5).  "Under the discovery rule, the statute of limitations begins to run from the date the injured party either knows or should know, by the exercise of reasonable diligence, that a cause of action exists for the wrongful conduct."  *Epstein v. Brown*, 610 S.E.2d 816, 818 (S.C. 2005).  "The exercise of reasonable diligence means simply that an injured party must act with some promptness where

the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Id*. "The statute of limitations begins to run from this point and not when advice of counsel is sought or a full-blown theory of recovery developed." *Id*.

Initially, Plaintiff argues the relevant inquiry is when she as trustee had sufficient knowledge of the facts giving rise to the causes of action asserted in this adversary proceeding. However, Plaintiff is incorrect because she has stepped into the Ladds' shoes in bringing this adversary proceeding. *See In re McFadden*, 471 B.R. 136, 162 (Bankr. D.S.C. 2012). The filing of a bankruptcy petition creates the bankruptcy estate, which includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). As chapter 7 trustee, Plaintiff "takes only such rights as the debtor had in the property under state law." *Drake v. Franklin Equip. Co.* (*In re Franklin Equip. Co.*), 418 B.R. 176, 210 (Bankr. E.D. Va. 2009). "In taking the rights of the debtor in property, the trustee also must bear the burden of any defenses that may be asserted." *Id*. "It is well established that a trustee in bankruptcy stands in the shoes of the debtor and has no greater rights than the debtor itself had. Thus, any defense, legal or equitable, which might have been raised against a debtor may be raised against the trustee." *Stratton v. Sacks*, 99 B.R. 686, 692 (D. Md. 1989) (citations omitted). Consequently, the relevant inquiry is not when Plaintiff learned sufficient facts but rather when the Ladds acquired sufficient knowledge to put them on notice.

In her response to the defendants' motions for summary judgment, Plaintiff concedes the filing of the Carroll County action "utilizing the forged security deed was the first time that a cause of action could have accrued." Docket 107, p. 25. She further asserts that "the statute of limitations would not begin to run until July 2, 2009, the date Christopher Ladd lost his security

clearance as a result of the lawsuit." *Id.* Even without this concession, the statute of limitations began to run on Plaintiff's causes of action, including the FDCPA and breach of contract accompanied by fraudulent act causes of action, contemporaneous with the time the complaint in the Carroll County action was filed. The wrongdoing Plaintiff alleges centers around First Georgia's alleged conduct in connection with Loan 2. Based on the allegations contained in the complaint filed in the Carroll County action and the fact there has been no argument that the Ladds were not served with the complaint at or around the time it was filed, the Ladds are charged with knowledge of the security deed and of First Georgia's position that Loan 2 was secured by more than a Chevy Tahoe. They also are charged with knowledge of First Georgia's position that Loan 1 was still outstanding and that Loan 2 did not consolidate and pay off Loan 1. Arguably, the statute of limitations may have started to run when Chris Ladd wrote the May 12, 2007 letter acknowledging First Georgia's position that it had a lien on the house or when the Ladds signed the July 2, 2007 forbearance agreement. However, because the outcome is the same no matter which of these dates is used, the Court will apply the July 2, 2009 date when Chris Ladd lost his security clearance as Plaintiff advances.

Absent the bankruptcy filing, the statutes of limitations would have run on all of Plaintiff's causes of action by early July 2012. However, the Ladds filed bankruptcy on July 22, 2010. Pursuant to 11 U.S.C. § 108(a):

> (a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of--
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> (2) two years after the order for relief.

Even applying section 108(a), in the absence of some type of suspension of the limitations period, the statute of limitations would have run on Plaintiff's FDCPA cause of action prior to the bankruptcy filing and on her state law causes of action two years after the Ladds filed bankruptcy.  This adversary proceeding was not filed until October 29, 2012.

Plaintiff asserts the tolling provision of the Servicemembers Civil Relief Act ("SCRA") applies to Chris Ladd.  This tolling provision provides that "[t]he period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns."  50 U.S.C. app. § 526(a).  The term "military service" in section 526(a) means:

> (A) in the case of a servicemember who is a member of the Army, Navy, Air Force, Marine Corps, or Coast Guard--
>> (i) active duty, as defined in section 101(d)(1) of title 10, United States Code, and
>> (ii) in the case of a member of the National Guard, includes service under a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days under section 502(f) of title 32, United States Code, for purposes of responding to a national emergency declared by the President and supported by Federal funds;
> (B) in the case of a servicemember who is a commissioned officer of the Public Health Service or the National Oceanic and Atmospheric Administration, active service; and
> (C) any period during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause.

50 U.S.C. app. § 511(2).  Plaintiff argues section 511(2)(A)(i) applies and that Chris Ladd was on active duty, as defined in 10 U.S.C. § 101(d)(1), during the time period in question.  Active duty is defined by 10 U.S.C. § 101(d)(1) as "full-time duty in the active military service of the United States.  Such term includes full-time training duty, annual training duty, and attendance, while in the active military service, at a school designated as a service school by law or by the

Secretary of the military department concerned.  Such term does not include full-time National Guard duty."  Plaintiff has the burden of proof with respect to whether the statutes of limitation for her causes of action should be tolled.  *See Lukenas v. Bryce's Mountain Resort, Inc.*, 538 F.2d 594, 597 (4th Cir. 1976); *Hooper v. Ebenezer Senior Serv. & Rehab. Ctr.*, 687 S.E.2d 29, 32 (S.C. 2009).

The military issued Chris Ladd several orders during the time period in question.  *See* Pl.'s ex. C (Docket 107-3).  In an order dated September 12, 2008, Chris Ladd was directed to "full time National Guard duty (FTNGD) with [his] consent and the consent of the Governor of South Carolina in Active Guard/Reserve (AGR) status" for a period of three years starting September 16, 2008.  *Id.*  He was ordered to report to the National Guard Armory in Myrtle Beach, South Carolina and serve as a "Training NCO."  *Id.*  The authority for the order was indicated as "32 USC 502(f)."  *Id.*  The order also provided that "[i]n the event your ARNG unit of assignment is called or ordered to Federal active duty, you will be terminated automatically from you[r] 32 USC 502(f) AGR status the day before the effective date of federalization."  *Id.*  Chris Ladd was issued a second order dated November 21, 2008, which stated he was "on active duty in Active Guard/Reserve (AGR) status, and with [his] consent and the consent of the Governor of South Carolina, [would] proceed on a permanent change of station as shown for the period indicated below."  *Id.*  The period indicated on the order is three years from September 16, 2008, and the change of station is to "READINESS NCO."  *Id.*  The authority for the order is again listed as "32 USC 502(f)."  Chris Ladd was issued a third order dated August 3, 2011, directing him to "full time National Guard duty (FTNGD) with [his] consent and the consent of the Governor of South Carolina in an Active Guard/Reserve (AGR) status" for a period of five years, four months, and sixteen days starting September 17, 2011.  *Id.*  He was ordered to serve

as Readiness NCO and "32 USC 502(f)" was indicated as the authority for the order. *Id*. Similar

to the September 12, 2008 order, the August 3, 2011 order provided that "[i]n the event your

ARNG unit of assignment is called or ordered to Federal active duty, you will be terminated

automatically from you[r] 32 USC 502(f) AGR status the day before the effective date of

federalization." *Id*. Chris Ladd was issued a fourth order on May 3, 2012, which stated he was

"on active duty in Active Guard/Reserve (AGR) status, and with [his] consent and the consent of

the Governor of South Carolina, [would] proceed on a permanent change of station as shown for

the period indicated below." *Id*. The period indicated on the order was four years, nine months,

and seven days from April 25, 2012, and the change of station was to Personnel. *Id*. He was

ordered to report to the National Guard Armory in North Charleston, South Carolina. *Id*. The

order referenced "32 USC 502(f)" as its authority. *Id*. Chris Ladd was given additional

instructions for this change of station in another order dated May 3, 2012. *Id*.

In arguing Chris Ladd was on active duty pursuant to these orders, Plaintiff relies on 10

U.S.C. § 101(b)(16), which states "the term 'Active Guard and Reserve' means a member of a

reserve component who is on active duty pursuant to section 12301(d)[4] of this title *or*, if a

member of the Army National Guard or Air National Guard, is on full-time National Guard duty

pursuant to section 502(f) of title 32,[5] and who is performing Active Guard and Reserve duty"

---

[4] Section 12301(d) provides that "at any time, an authority designated by the Secretary
concerned may order a member of a reserve component under his jurisdiction to active duty, or
retain him on active duty, with the consent of that member. However, a member of the Army
National Guard of the United States or the Air National Guard of the United States may not be
ordered to active duty under this subsection without the consent of the governor or other
appropriate authority of the State concerned."

[5] Title 32, section 502(f)(1) of the United States Code provides that "under regulations to
be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a
member of the National Guard may--(A) without his consent, but with the pay and allowances
provided by law; or (B) with his consent, either with or without pay and allowances; be ordered
to perform training or other duty in addition to that prescribed under subsection (a)."

(emphasis added).  Plaintiff also relies on 10 U.S.C. § 101(d)(6)(A), which states "the term

'active Guard and Reserve duty' means active duty performed by a member of a reserve

component of the Army, Navy, Air Force, or Marine Corps, *or* full-time National Guard duty

performed by a member of the National Guard pursuant to an order to full-time National Guard

duty, for a period of 180 consecutive days or more for the purpose of organizing, administering,

recruiting, instructing, or training the reserve components" (emphasis added).  Based on the

language of the military orders during the time period in question, Chris Ladd was not on active

duty as that term is defined in 10 U.S.C. § 101(d)(1).  With respect to Plaintiff's argument

regarding section 101(b)(16) and 101(d)(6)(A), Chris Ladd fell within the second category of the

definitions of "Active Guard and Reserve" and "active Guard and Reserve duty," not the active

duty category.  The September 12, 2008 order and August 3, 2011 order state that Chris Ladd

was on full-time National Guard duty.  Section 101(d)(1) expressly excludes full-time National

Guard duty from the definition of active duty.  Further, the September 12th and August 3d order

indicate that he was on "32 USC 502(f) AGR status," and all four orders reference "32 USC

502(f) as their authority.  Moreover, the plain language of the November 21, 2008 order and May

3, 2012 order is that these orders only changed Chris Ladd's station.  These orders did not

change Chris Ladd's status such that he fell within the active duty definition of "Active Guard

and Reserve" and "active Guard and Reserve duty."  *See* 10 U.S.C. §§ 101(b)(16); 101(d)(6)(A).

Rather, he remained in the second category contained in the definitions of "Active Guard and

Reserve" and "active Guard and Reserve duty."  *See* 10 U.S.C. §§ 101(b)(16); 101(d)(6)(A).

Plaintiff also relies on 10 U.S.C. § 12602(a)(2) in arguing Chris Ladd falls within the

scope of the tolling provision of the SCRA.  Section 12602(a)(2) states that "[f]or the purposes

of laws providing benefits for members of the Army National Guard of the United States and

their dependents and beneficiaries[,] . . . full-time National Guard duty performed by a member of the Army National Guard of the United States shall be considered active duty in Federal service as a Reserve of the Army."  However, section 12602(a)(2) does not bring Chris Ladd's service within the tolling provision of the SCRA.  Section 12602(a) indicates its provisions are only "for the purposes of laws providing benefits for members of the Army National Guard of the United States and their dependents and beneficiaries."  In addition, the definition of "military service" in the SCRA incorporates the definition of "active duty" contained in 10 U.S.C. 101(d)(1), which, in turn, excludes full-time National Guard duty from what constitutes active duty.  *See* 50 U.S.C. app. §§ 511(2)(A)(i); 10 U.S.C. 101(d)(1).  Section 12602(a)(2) does not supersede the definition of active duty contained in section 101(d)(1) and render section 101(d)(1)'s exclusion of full-time National Guard duty from active duty meaningless.  *See Bowen v. United States*, 292 F.3d 1383, 1387 (Fed. Cir. 2002).

Plaintiff alleges an attorney at PPDPR sent a letter to her dated July 5, 2011, describing the basis for the proof of claim First Georgia filed in the Ladds' bankruptcy.  Plaintiff argues in her response to PPDPR's motion for summary judgment that this letter violated the FDCPA.  Docket 107, pp. 28-29.  Plaintiff also advances that "Vieira, the representative of the estate, was first put on notice that a claim may exist when she first heard from the Ladds of the abysmal acts of the Defendants at the 341 meeting, which was held September 16, 2010."  Docket 107, p. 20.  There is no information or accusations against the Ladds in the July 5, 2011 letter that is not also contained in the complaint filed in the Carroll County action, and the Court concludes this letter did not give rise to a new FDCPA cause of action for which the limitations period began running when Vieira received the letter.  *See Kirscher v. Messerli & Kramer P.A.*, No. Civ. 05-1901PAMRLE, 2006 WL 145162, at *4-5 (D. Minn. Jan. 18, 2006); *Sierra v. Foster & Garbus*,

48 F. Supp. 2d 393, 395 (S.D.N.Y. 1999); *Calka v. Kucker, Kraus, & Bruh, LLP*, No. 98 Civ.

0990(RWS), 1998 WL 437151, at \*3 (S.D.N.Y. Aug. 3, 1998).  Even if the July 5, 2011 letter is

treated as a separate act that gives rise to a separate cause of action and the one-year limitations

period under 15 U.S.C. § 1692k(d) began running at the point Vieira received this letter, the

Court concludes that Plaintiff's FDCPA cause of action is not timely because the extension of

time contained in 11 U.S.C. § 108(a) does not apply to causes of action that arise postpetition.

*See Indep. Fire Ins. Co. v. Pender* (*In re Phillip*), 948 F.2d 985, 987 (5th Cir. 1991); *Northern*

*Specialty Sales, Inc. v. INTV Corp.* (*In re Northern Specialty Sales, Inc.*), 57 B.R. 557, 559

(Bankr. D. Or. 1986).  This same analysis applies to any argument by Plaintiff that the filing of

First Georgia's proof of claim on February 7, 2011, started a new limitations period for her

FDCPA cause of action.

Plaintiff has not argued the limitations period on any of her state law causes of action

began running when Vieira received the July 5, 2011 letter or when First Georgia's proof of

claim was filed.  Furthermore, she concedes the statute of limitations began running on July 2,

2009, when Christopher Ladd lost his security clearance as a result of the Carroll County action.

Docket 107, p. 25.

*2. Other grounds for granting the defendants' motions*

In addition to being barred by the applicable statutes of limitation, additional grounds

exist for granting the defendants' motions for summary judgment with respect to all of Plaintiff's

causes of action.

a. FDCPA

Plaintiff's cause of action for violation of the FDCPA is asserted against PPDPR only.  In

addition to being entitled to summary judgment on statute of limitations grounds, summary

judgment is also appropriate because PPDPR is protected by the "bona fide error" defense contained in 15 U.S.C. § 1692k(c).  Section 1692k(c) provides that "[a] debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."  The attorney at PPDPR who represented First Georgia in all of the matters in question avers in an affidavit that he and his former secretary are the only people at the firm who worked on the Carroll County action.  Docket 104-5.  He also states in his affidavit that he did not forge the Ladds' signatures or alter the documents used to support the Carroll County action and First Georgia's proof of claim in any way.  *Id.*  Additionally, he indicates he was not aware of any questions regarding the authenticity of signatures on the documents supporting the proof of claim and the Carroll County action.  *Id.*  His former secretary's affidavit contains the same averments. Docket 104-6.  The Fourth Circuit has rejected an argument that the FDCPA creates "a heightened duty of investigation for lawyers engaged in ordinary debt collection activity." *McLean v. Ray*, 488 Fed. Appx. 677, 683 (4th Cir. 2012).  PPDPR was entitled to "rely on [its] client's word."  *Id.*  Plaintiff has not provided evidence contradicting the affidavits of the attorney at PPDPR and his former secretary.  Rather, the Ladds indicate in their deposition testimony that they do not know who forged their signatures.  This testimony is not sufficient to give rise to a genuine dispute of material fact in connection with the "bona fide error" defense. Therefore, summary judgment on Plaintiff's FDCPA claim is appropriate because PPDPR is protected by the provisions of 15 U.S.C. § 1692k(c).

### b. Fraudulent misrepresentation and negligent misrepresentation

Not surprisingly, an element of the causes of action for fraudulent misrepresentation and negligent misrepresentation under both South Carolina and Georgia law is that the defendant made a representation that was false.  *See Lewis v. Omni Indem. Co.*, 970 F. Supp. 2d 437, 452 (D.S.C. 2013); *Grand Master Contracting, LLC v. Lincoln Apartment Mgmt Ltd. P'ship*, 724 S.E.2d 456, 458 (Ga. Ct. App. 2012); *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 479 S.E.2d 727, 729 (Ga. 1997).  The two misrepresentations Plaintiff alleges are that a First Georgia employee told the Ladds Loan 2 would consolidate Loan 1 and that a First Georgia employee told the Ladds Loan 2 would only be secured by a Chevy Tahoe.  Docket 107, p. 32.  With respect to the second alleged misrepresentation, Plaintiff cites to no evidence in her response to the motions for summary judgment supporting her allegation that a First Georgia employee told the Ladds Loan 2 would only be secured by a Chevy Tahoe.  Docket 107, pp. 32-34.  The allegations in the second amended complaint are not evidence.  As for the alleged misrepresentation regarding Loan 2 consolidating Loan 1, Chris Ladd agreed the proceeds of Loan 2 paid off Loan X.  CertusBank's ex. L; CertusBank's ex. M; C. Ladd Dep. 116-20.  In addition, the testimony Plaintiff cites in her response to the motions for summary judgment does not support her position regarding a misrepresentation being made that Loan 2 would consolidate Loan 1.  Docket 107, pp. 32-34.  Chris Ladd testified the consolidation loan he believed existed occurred prior to his being deployed to Iraq, and he returned from Iraq in May of 2006.  C. Ladd Dep. 87-90, 97-98.  He agreed Loan 2 was signed on June 8, 2006, after he returned from Iraq.  *Id*. at 97-98.  Plaintiff has not presented evidence upon which a rational trier of fact could find the two alleged misrepresentations took place.  Furthermore, Plaintiff cites no legal authority in support of the proposition that First Georgia had a duty to affirmatively tell the Ladds the

Newnan property would be collateral for Loan 2 and that not making this affirmative statement constitutes a misrepresentation. Docket 107, p. 34. Consequently, summary judgment is appropriate.

Moreover, to the extent an argument can be made that the proof of claim and July 5, 2011 letter began the statute of limitations anew, CertusBank is entitled to summary judgment because reliance is an element that must be proven to prevail on causes of action for fraudulent misrepresentation and negligent misrepresentation, and Plaintiff has not presented evidence of reliance on either the proof of claim or the letter. *See Lewis v. Omni Indem. Co.*, 970 F. Supp. 2d 437, 452 (D.S.C. 2013); *Grand Master Contracting, LLC v. Lincoln Apartment Mgmt Ltd. P'ship*, 724 S.E.2d 456, 458 (Ga. Ct. App. 2012); *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 479 S.E.2d 727, 729 (Ga. 1997). The fact that Vieira filed this adversary proceeding and has not distributed funds towards the proof of claim First Georgia submitted demonstrates she did not rely on the proof of claim or the letter, and Plaintiff has not indicated how the Ladds relied on the letter or the proof of claim.

### c. Breach of contract accompanied by fraudulent act

Plaintiff's cause of action for breach of contract accompanied by fraudulent act is alleged against CertusBank only. Loan 2 contains a provision stating that "it will be governed by the laws of the State of Georgia except to the extent that federal law controls." CertusBank's ex. D. Plaintiff has not responded to CertusBank's argument that, based on this provision in Loan 2, Georgia substantive law applies to her breach of contract accompanied by fraudulent act cause of action. Plaintiff also has not presented any case law in which Georgia recognizes such a cause of action, and the Court has not located any.

Under Georgia law, "[u]nless otherwise provided by law, exemplary damages shall never be allowed in cases arising on contracts." Ga. Code Ann. § 13-6-10. However, "[e]ven in an action for breach of contract, where there were matters of record relating to fraud, punitive damages can be awarded, for '[f]raud, if found, is tortious conduct.'" *Clark v. Aenchbacher*, 238 S.E.2d 442, 444 (Ga. Ct. App. 1977) (quoting *Diana v. Monroe*, 209 S.E.2d 70, 72 (Ga. Ct. App. 1974)) (second alteration in original). Consequently, it appears that for Plaintiff to prevail on her cause of action for breach of contract accompanied by fraudulent act, she needs to prove both a breach of contract and fraud. For the reasons set forth in the section on Plaintiff's fraudulent misrepresentation cause of action, summary judgment is appropriate because Plaintiff has not presented evidence upon which a rational trier of fact could find the misrepresentations alleged by her occurred.

### d. Conversion

Plaintiff alleges in the second amended complaint that CertusBank converted the proceeds of Loan 2. However, it is now undisputed that the proceeds of Loan 2 were used to pay off Loan X. CertusBank's ex. L; CertusBank's ex. M; C. Ladd Dep. 116-18, 120. Given this undisputed fact, Plaintiff has presented no argument or evidence in support of the continued viability of her conversion cause of action. CertusBank, therefore, is entitled to summary judgment on this cause of action.

### e. Conspiracy

Plaintiff's conspiracy cause of action is alleged against both defendants. Plaintiff has not taken a clear position with respect to whether Georgia or South Carolina substantive law applies to her conspiracy cause of action. "It is well settled that a federal court sitting in diversity applies the conflict of laws provisions of the forum state, here South Carolina, if it does not

violate due process to do so under the facts of the particular case." *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 87 (4th Cir. 1989). "Under traditional South Carolina choice of law principles, the substantive law governing a tort action is determined by the state in which the injury occurred." *Lister v. NationsBank of Del., N.A.*, 494 S.E.2d 449, 454 (S.C. Ct. App. 1997). PPDPR asserts South Carolina substantive law applies because the Ladds lived in South Carolina when the alleged injuries in connection with the filing of the Carroll County action occurred. Plaintiff has not contested this assertion. Therefore, the Court concludes South Carolina substantive law applies to Plaintiff's conspiracy cause of action.

Under South Carolina law, the elements of a civil conspiracy are "(1) the combination of two or more people, (2) for the purpose of injuring the plaintiff, (3) which causes special damages." *Pye v. Estate of Fox*, 633 S.E.2d 505, 511 (S.C. 2006). "The 'essential consideration' . . . 'is not whether lawful or unlawful acts or means are employed to further the conspiracy, but whether the primary purpose or object of the combination is to injure the plaintiff.'" *Id.* (quoting *Lee v. Chesterfield Gen. Hosp., Inc.*, 344 S.E.2d 379, 383 (S.C. Ct. App. 1986)). "'[I]n order to establish a conspiracy, evidence, direct or circumstantial, must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise.'" *Id.* (quoting *Island Car Wash, Inc. v. Norris*, 358 S.E.2d 150, 153 (S.C. Ct. App. 1987)) (alteration in original).

The evidence before the Court is that the only two individuals at PPDPR who worked on the Carroll County action aver they did not forge the Ladds' signatures on any documents and were not aware of any issues with respect to the authenticity of the Ladds' signatures. Docket 104-5; 104-6. While the Ladds dispute the authenticity of their purported signatures on certain documents, including the security deed, they do not know who signed their names to these

documents.  Based on this record, Plaintiff has not produced evidence upon which a rational trier

of fact could find the defendants combined together for the purpose of injuring the Ladds, and

summary judgment is thus appropriate.[6]

### f. Abuse of process

Aside from asserting its causes of action are not barred by the statutes of limitation

involved, Plaintiff neither responded to PPDPR's arguments regarding why it is entitled to

summary judgment on Plaintiff's abuse of process cause of action nor attempted to identify

evidence supporting the viability of this cause of action.  *See Hainer v. Am. Med. Int'l, Inc.*, 492

S.E.2d 103, 107 (S.C. 1997) ("The essential elements of abuse of process are an ulterior purpose

and a willful act in the use of the process not proper in the conduct of the proceeding.").

Consequently, Plaintiff has failed to produce evidence creating a genuine dispute of material

fact, and PPDPR is entitled to summary judgment on this basis in addition to being entitled to

summary judgment on statute of limitations grounds.

---

[6] Even if Georgia substantive law applied, it would not alter this conclusion.  *See First Fed. Sav. Bank v. Hart*, 363 S.E.2d 832, 833 (Ga. Ct. App. 1987) ("A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means.").  PPDPR also argues it is entitled to summary judgment because the alleged wrongful acts arose in the context of a principal-agent relationship between the defendants and "by virtue of [that] relationship such acts do not involve separate entities." *McMillan v. Oconee Mem'l Hosp., Inc.*, 626 S.E.2d 884, 886-87 (S.C. 2006).  However, *McMillan* involved a jury that returned a verdict for civil conspiracy against a single corporate entity, and the South Carolina Supreme Court's reversed the trial court's denial of a motion for judgment notwithstanding the verdict based on the principle that "a corporation cannot conspire with itself." *Id.* at 887.  Given the existence of other reasons for granting summary judgment described in this Order, it is unnecessary to rule on whether the alleged principal-agent relationship between the defendants precludes Plaintiff's conspiracy cause of action.

*3. PPDPR's counterclaim*

In its answer, PPDPR counterclaimed for attorney fees under 15 U.S.C. § 1692k(a)(3). PPDPR has indicated it consents to the dismissal of its counterclaim if summary judgment is granted as to all of Plaintiff's causes of action.

## CONCLUSION

For the reasons set forth herein, the defendants' motions for summary judgment are granted; the counterclaim of defendant Price, Pyles, Dangle, Parmer & Rooks, P.C. is dismissed; and this adversary proceeding is dismissed in its entirety.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**09/04/2014**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 09/04/2014